UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| LYNANN SCHUNOT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 4:07-CV-5-AS-APR |
| ) | |
| MICHAEL ASTRUE, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM, ORDER & OPINION

Plaintiff, Lynann Schunot ("Ms. Schunot"), seeks judicial review of the denial of her claim for benefits and a period of disability under Title II of the Social Security Act. The Commissioner of Social Security found Ms. Schunot entitled to neither Disability Insurance Benefits ("DIB") nor Security Income Benefits ("SSI") under Title II of the Social Security Act, 42 U.S.C. § 416 (I), 423. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Ms. Schunot applied for DIB and SSI on or about May 31, 2005 (Tr. 48-50). The application was denied on October 25, 2005 and the request for reconsideration was denied on February 6, 2006 (Tr. 32-35, 40). Ms. Schunot then requested a hearing in front of the Administrative Law Judge ("ALJ"), Steven E. Davis, which was conducted on July 12, 2006 (Tr. 43, 10-22). After the ALJ denied Ms. Schunot's application, she requested review by the Appeals Council, which was denied on November 14, 2006 (Tr. 4).

## I. Background

A. Statement of Facts

At the time of her alleged disability onset date of March 1, 2004, Ms. Schunot was forty years old, and had attended school through the seventh grade, later obtaining her General Equivalency Diploma and certification as a nurse's assistant (Tr. 48, 82-83). Ms. Schunot worked as a nurse's assistant for twenty-five years prior to her alleged onset date, at which point she ceased working (Tr. 76-77).

B. Medical Evidence

Throughout the period in which she is claiming disability, Ms. Schunot was seen by numerous medical professionals, including personal physicians, a mental health counselor, a psychiatrist, and those reviewing/consultative physicians and psychiatrists who evaluated Ms. Schunot and her records pursuant to her disability claim.

First, in February, 2004, one week prior to her alleged onset date, Ms. Schunot visited her family physician Dr. Andrew Edwards ("Dr. Edwards") complaining of a sore throat and "slight achiness" (Tr. 244). On June 4, 2004, three months after her alleged onset date, Dr. Edwards again treated Ms. Schunot, this time for a spider bite on her hand (Tr. 243).

A few weeks later, on July 21, 2004, Ms. Schunot returned to Dr. Edwards, stating that she was going through a divorce, was depressed and had been depressed for six months (Tr. 424). Dr. Edwards prescribed anti-depressant medication, and, on September 1, 2004, stated that Ms. Schunot's depression was "stable" (Tr. 242, 235).

Additionally, at her September visit to Dr. Edwards, Ms. Schunot complained of hemorrhoids with constant bleeding (Tr. 234). Dr. Edwards described her as "generally healthy" despite her ongoing hemorrhoid pain (Tr. 235). Ms. Schunot then underwent an excision of her hemorrhoids later that month, with "markedly improved" symptoms by September 29, 2004 (Tr. 226).

In November 2004, Ms. Schunot again visited Dr. Edwards, this time complaining of a rash and right elbow pain due to an accident with a gurney (Tr. 223). Additionally, Ms. Schunot was concerned about a prior ultrasound showing uterine fibroids, for which she was referred to a gynecologist. Id. At the time Dr. Edwards noted that, despite her elbow pain, Ms. Schunot had a "full range of motion." Id.

In February 2005, Ms. Schunot again returned to Dr. Edwards complaining of chest pain and a cough (Tr. 210-211). That same month, Dr. Edwards referred Ms. Schunot to liscensed mental health counselor Marcus Jacobs (Tr. 149-151). At her consultation Ms. Schunot reported to Mr. Jacobs the following: she had a hard time functioning and "lots of guilt" from her divorce, she constantly scratched herself to the point of bleeding and was on medication for this, she enjoyed playing pool, and was captain of a team that was thirteenth in the state, drank a six-pack a week while playing pool, and had smoked pot two months prior to her visit. Id. Mr. Jacobs diagnosed Ms. Schunot with major depression and general anxiety and assigned her a Global Assessment of Functioning ("GAF") of 55. Mr. Jacobs referred Ms. Schunot back to Dr. Edwards for a medical examination. Id.

One month later, in March 2005, Ms. Schunot returned to Dr. Edwards complaining

of joint pain in all of her joints, shortness of breath, tenderness in her finger joints, shoulders, and trapezius muscle area on palpitation. (Tr. 210). Dr. Edwards observed no joint swelling. Id.

In April 2005, Mr. Jacobs, the mental health counselor, referred Ms. Schunot to Psychologist Dr. Rebecca Kloker (Tr. 145-48). Ms. Schunot reported to Dr. Kloker that she did not feel she could work due to her physical problems but that she did not feel suicidal. Id. Dr. Klocker noted that Ms. Schunot was alert and oriented with adequate attention and concentration, fair judgement, logical speech, and an intact memory. Id. Dr. Kloker assigned Ms. Schunot a GAF of 60 and recommended that she stop taking certain medications was previously prescribed. Id.

In May 2005, Dr. Edwards referred Ms. Schunot to Rheumatologist Arthur Kaluta (Tr. 201-03). Dr. Kaluta found no synovitis in Ms Schunot's finger joints but did note cacified spurs over the second and third distal interphalaneal joints. Id. Dr. Kaluta further noted that Ms. Schunot had full range of motion of in her wrists, elbows, shoulders, cervical spine, lumber spine, hips, knees and ankles. Id. Moreover, he noted that Ms. Schunot's reflexes and muscle strength were normal. Dr. Kaluta opined that Ms. Schunot had generalized myalgias and anthralgias with an underlying history of depression that strongly suggested fibromyalagia as the cause of her pain. Id. Specifically, Dr. Kaluta noted that Ms. Schunot's symptoms were "not very specific and more suggestive of a psychogenic component of pain rather than underlying anatomic derangement" (Tr. 202). Dr. Kaluta gave Ms. Schunot Lidoderm patches to treat her pain and ordered laboratory tests and x-rays of her back and

sacrioliac area. Id. The x-rays and lab tests, which were performed later that same month, revealed only mild degenerative changes (Tr. 197). At the time, Ms. Schunot reported that the patches had not eased her pain and Dr. Kaluta discussed fibromyalgia treatment options with Ms. Schunot and gave her the telephone number for a fibromyalgia study. Id.

In August 2005, Ms. Schunot was evaluated by Psychologist David Jarmon at the Agency's request (Tr. 167-69). Ms. Schunot told Dr. Jarmon that she had quit working in July 2004 when she had hemorrhoids, she found it depressing to work with people in a nursing home and cried every day when she worked in the cancer unit. Id. Further, she reported that she was unable to live on her own and moved back in with her ex-husband. Id. She also stated that her depression had diminished since she began treatment, however Ms. Schunot also stated that her daily activities were limited to cleaning the house in spurts, walking short distances, swimming occasionally, and crying and sleeping much of the day. Id. Dr. Jarmon diagnosed Ms. Schunot with mood disorder due to fibromyalgia with depressive features and assigned Ms. Schunot a GAF of 55. Id.

In August 2005, Ms. Schunot returned to Dr. Edwards complaining of a toothache, knee pain, and flu-like symptoms (Tr. 190). In September 2005 she complained of a rash and bruise as a result of getting head butted from a crowd (Tr. 191). And in October 2005, Ms. Schunot sprained her ankle (Tr. 189).

Next, in January 2006 Ms. Schunot was examined by Dr. R. Newton pursuant to her benefits claim (Tr. 251-54). Dr. Newton noted that Ms. Schunot was able to get on and off of the examination table without difficultly, had normal gait and station, and could bend over

without difficulty. Id. Further, Dr. Newton noted that Ms. Schunot had fourteen out of eighteen trigger points for fibromyalgia and could not walk on her heels or toes without difficulty. Id. Also, Dr. Newton noted that Ms. Schunot had full motor strength, normal reflexes, full and normal hand grip, and was able to handle small objects and button clothing. Id.

Psychologists reviewed Ms. Schunot's record at the request of the State Agency in September 2005 and January 2006 (Tr. 184-86, 249). They concluded: (1) that she was able to perform simple repetitive tasks on a sustained basis without extraordinary accommodations, (2) that she would work best alone or as part of a small group but could not work with the public in jobs requiring much contact with others, (3) that she would have problems with a supervisor who was often negative or critical but could work with a supervisor of normal consideration, (4) that she should be able to attend to a task for two hours, and (5) that there would be days when she would feel overwhelmed by her condition and would be absent but that these days were not expected to occur with overwhelming frequency. Id.

Additionally, medical physicians reviewed Ms. Schunot's medical records on behalf of the State Agency in July 2005 and February 2006 and concluded that she could: (1) lift 50 pounds occasionally, (2) lift 25 pounds frequently, (3) stand or walk six hours in an eight hour day, and (4) perform unlimited pushing and pulling (Tr. 159-66, 264). Additionally, the physicians concluded that Ms. Schunot had no postural, manipulative, or environmental limitations. Id.

Finally, in February 2006 Ms. Schunot visited her doctor complaining of irregular periods, anxiety, and bronchitis (Tr. 265).

C. Social Security Questionnaire

On July 9, 2005, Valerie Marin, Ms. Schunot's sister, filled out a questionnaire for the State Agency in which she reported that Ms. Schunot , "...used to be able to work and play pool. But her hands and Body (sic) hurt her so bad." (Tr. 93). Further she stated that Ms. Schunot, "takes shower (sic) now because it is to (sic) hard to get up and down" and further stated that it was difficult for Ms. Schunot to stand, sit, or walk too far. Id.

D. Hearing Testimony

On June 29, 2006, a hearing was held in which Ms. Schunot and Constance Brown, a vocational expert, testified.

At the hearing Ms. Schunot testified that she stopped working because of general pain and discomfort (Tr. 274). Specifically she testified as to the following medical complaints: pain in her hands and feet, limitations on sitting and standing, ankle weakness and severe pain in her knees, her knees giving out if she got up after sitting too long, severe hip pain if she laid on her side for an hour, neck pain, irritable bowel syndrome, pain that grew worse if she tried activities, and pain that was worse in the morning (Tr. 274-78). Ms. Schunot testified that the medication Relafen eased her pain (Tr. 274). Further, she stated that she did not sleep well due to pain and anxiety and that she scratched herself and drew blood every day, a condition for which her doctor had placed her on Atarax. (Tr. 278-79, 284).

Additionally, Ms. Schunot testified about her psychological health, stating that her

mind wandered, she had thoughts of suicide and cried constantly, and that she did not "do crowds" because she became anxious (Tr. 275, 280). She also testified that she took Zoloft and Klonopin for depression, which helped "[a] little bit" but made her drowsy and unable to sleep (Tr. 275, 281).

Finally, as to her daily activities, Ms. Schunot testified that she did not go grocery shopping, or do laundry, housecleaning, or yard work (Tr. 275. 281). She reported that she drove, but not for long uninterrupted distances, and spent a typical day sitting and inactive (Tr. 275-76). She could walk three or four blocks at a time but was unable to mop or vacuum because her hands and arms went numb (Tr. 276-81). She usually did not wear clothes with buttons, dropped things due to losing feeling in her hands, and had a hard time with steps (Tr. 281-82). Further, she no longer played pool due to pain in her hands, having last played two years earlier (Tr. 282). She read the newspaper, but did not read books due to difficulty concentrating or use a computer due to hand numbness (Tr. 283).

In addition to Ms. Schunot, vocational expert Constance Brown also testified at the administrative hearing (Tr. 285-89). The vocational expert testified that an individual with the sort of hand limitations about which Ms. Schunot testified would not be able to work any job (Tr. 289). However, the ALJ posed a hypothetical question to the vocational expert, asking her to assume an individual with the following characteristics: someone who could not work with the general public or in jobs that required intensive interpersonal contact with others, someone who would work best alone in semi-isolation or as part of a small group, someone who could work with a supervisor who was normally considerate and positive but

would have problems with a supervisor who was often negative, critical, or quarrelsome, and someone who could attend to a task for a two-hour period of time and could perform simple, repetitive tasks (Tr. 285-86). The vocational expert testified that this hypothetical individual could not perform Ms. Schunot's past relevant work as a CNA or any work to which her skills from that job might transfer (Tr. 286). Yet, the vocational expert also testified that there were thousands of jobs, such as clerical work, that an individual could perform despite the limitations set forth in the ALJ's hypothetical (Tr. 286-87).

## II. Standard of Review

This Court's review of the Commissioner's decision is a limited one. Unless there is an error of law, this Court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Shoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). In making a substantial evidence determination, this Court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999).

That being said, this Court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). This Court must ensure that the ALJ has built "an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). However, if reasonable minds could disagree on whether an individual is disabled, the court

must affirm the Commissioner's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. Discussion

Generally, "[b]enefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th.Cir.1998). Specifically, the claimant bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir.1976) (citing *Jeralds v. Richardson*, 445 F.2d 36, 38-39 (7th Cir. 1971)). Furthermore, the claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The regulations supporting the Social Security Act create a five-step inquiry in determining whether a claimant is disabled, under which the ALJ must consider the applicant's claim in the following sequence:

> (1) whether the claimant is currently employed;
> (2) whether she has a severe impairment;
> (3) whether her impairment meets or equals one listed by the Secretary;
> (4) whether the claimant can perform her past work; and
> (5) whether the claimant is capable of performing any work in the national economy.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520). The initial burden in steps one through four is on the plaintiff; only at step five does the burden

shift to the Commissioner. *Bolinger v. Barnhart*, 446 F. Supp. 2d 950, 955 (N.D.Ind. 2006).

In this case, the ALJ concluded at step one of the five-step disability determination, that Mrs. Schunot had not engaged in substantial gainful activity since the alleged onset date of her disability, May of 2004 (Tr. 14). The ALJ also found at steps two and three that Ms. Schunot had two severe impairments - depression and fibromyalgia - and, though the ALJ assessed Ms. Schunot's fibromyalgia under Listing 1.02 and her depression under Listing 12.04, he found that neither met or equaled an impairment listed by the Secretary (Tr. 14-17); 20 C.F.R. § 404.1520 (c, d). Next, at step four, the ALJ found that Ms. Schunot could not perform her past work as a CNA (Tr.20); 20 C.F.R. § 404.1520(e,f). Finally, the ALJ found that Ms. Schunot was capable of performing a limited range of medium work with simple and repetitive tasks and without contact with the general public or extensive interaction with coworkers (Tr. 17-20). Thus, relying on the vocational experts testimony, the ALJ found that Plaintiff could perform a significant number of other jobs despite the limitations caused by her impairments (Tr. 20-22); 20 C.F.R. § 404.1520(g). Accordingly, the ALJ denied Ms. Schunot's applications for DIB and SSI (Tr. 22).

On appeal before this Court, Ms. Schunot argues that the ALJ did not follow the law in determining that her fibromyalgia was not preclusive of her being employed (Pl. Br. at 7). Specifically, Ms. Schunot argues that the ALJ "did not build an accurate and logical bridge from the evidence to his conclusions in this case." Id.

Generally, an ALJ's decision will only be overturned where it lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-414 (7th Cir. 2008). With regard to

fibromyalgia, the Seventh Circuit has specifically noted the elusiveness of the disease and has, in at least one case, remanded due to an ALJ's "pervasive misunderstanding of the disease," "shaky understanding of the medical facts," and "unfounded sociological speculations." See *Sarchet v. Chater*, 78 F.3d 305, 307-08 (7th Cir. 1996) (noting that fibromyalgia is "a common, but elusive and mysterious, disease"). Further, when an applicant produces medical evidence of an underlying impairment, an ALJ must not deny an applicant benefits merely because that applicant's disabling pain is not supported by objective evidence. See *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004) (remanding where an ALJ disregarded a "long history of treatment" merely due to the absence of objective evidence). Overall, "an ALJ's decision if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Accordingly, if reasonable minds could disagree on whether an individual is disabled, the court must affirm the ALJ's decision denying benefits. *Schmidt*, 201 F.3d at 972.

A. The ALJ's understanding of Fibromyalgia

Ms. Schunot first argues that the ALJ erred in considering Ms. Schunot's physical examinations in the course of determining that her fibromyalgia was a serious but not disabling condition (Pl. Br. 8). Counter to Ms. Schunot's argument, the ALJ's reasoning in her case is not analogous to that of the ALJ in *Sarchet*. First, unlike in *Sarchet*, here the ALJ concluded that Ms. Schunot does, in fact, suffer from fibromyalgia. His reason for denying Ms. Schunot Social Security benefits stems from his conclusion that, despite the seriousness

of her fibromyalgia, Ms. Schunot is nonetheless able to perform a significant number of jobs in the national economy. Moreover, unlike in *Sarchet*, where the ALJ failed to understand fibromylagia or the medical evidence present in that case, here the ALJ specifically took note of the *Sarchet* case and the sensitive nature of fibromyalgia. Ms. Schunot has presented no evidence that the ALJ had an unclear understanding of the disease or of her particular medical facts. Accordingly, this case is distinguishable from *Sarchet* and the ALJ's decision is supported by substantial evidence.

B. Evidence Supporting or Contradicting Claimant's Testimony

Additionally, Ms. Schunot alleges that the reasons given by the ALJ for his determination are insufficient because he questioned her testimony concerning her limitations in performing daily activities. Ms. Schunot points to the *Carradine* case in arguing that the lack of objective medical evidence supporting her testimony should not have been relevant to the ALJ's consideration of her testimony. Ms. Schunot is correct in arguing that it is improper for an ALJ to dismiss testimony of an ailment like fibromyalgia merely because that testimony is not supported by objective evidence. However, unlike in *Carradine*, in the present case the ALJ did not base his opinion on a lack of objective evidence; he based his opinion on the lack of subjective complaints on Ms. Schunot's part that would support her disability as of her May 2004 onset date.

Specifically, the ALJ noted that Ms. Schunot did not complain of arthritus-like symptoms until March, 2005 (Tr. 7). He further stated that her main complaints in August of that year were a toothache and knee pain. Id. In addition, the ALJ specifically noted

evidence of Ms. Schunot playing pool and serving as captain of her pool team in June 2005, in the midst of her alleged disability (Tr. 19). Although Ms. Schunot may disagree with the ALJ's conclusions, it is clear that the ALJ supported his findings with more than merely asserting a lack of objective evidence, as was the case in *Carradine*. On the contrary, in the present case the ALJ examined the complaints that Ms. Schunot made in the months after her alleged onset date and the evidence that she herself gave in arriving at his conclusion.

C. Evidence of Limited Daily Activities

Finally, Ms. Schunot argues that the ALJ erred in disregarding evidence of her limited daily activities. Specifically, Ms. Schunot states that there was sufficient evidence of her limitations in the form of her sister's affidavit (Pl. Br. 10). Although Ms. Schunot is correct in pointing out that some of her claims are corroborated by her sister's affidavit, this is an insufficient basis upon which to remand the case. This Court takes note of the Seventh Circuit's statements in *Schmidt* and *Scheck* and concludes that even if it were to find that the affidavit of Ms. Schunot's sister constitutes substantial evidence in support of Ms. Schunot's position, there is, nonetheless, substantial evidence supporting the ALJ's determination. Such evidence includes the lack of evidence of Ms. Schunot complaining of any fibromyalgia-like symptoms until nearly a year after her alleged disability onset date, and the conflicting evidence regarding her limited daily activities, and the fact that no physician who examined Ms. Schunot opined that she had disabling limitations. Therefore this Court finds substantial evidence that the ALJ build an accurate and logical bridge from the evidence to his conclusions.

## IV. Conclusion

The purpose of this Court's review of the ALJ's decision is to ensure that it is supported by substantial evidence. Therefore, since the ALJ's decision was supported by substantial evidence, the decision of the Commissioner is **AFFIRMED. SO ORDERED**.

**DATED:   September 5, 2008**

     /s/ Allen Sharp
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**